THE WALTER WALLINGFORD COAL CO. v. THE CUYA-
HOGA BUILDERS SUPPLY CO.

*Contracts—New terms imposed upon acceptance of offer—Assent to new terms by doing business.*

Where the acceptance of an offer to sell a product of a specified quality at a stipulated price imposes new terms as to kind and quality, the assent to such new terms may be inferred from the fact that the parties proceed to do business under the conditional acceptance.

(Decided December 17, 1923.)

ERROR: Court of Appeals for Hamilton county.

*Messrs. Kelley & Remke,* for plaintiff in error.
*Mr. Robert P. Goldman,* for defendant in error.

CUSHING, J. This is an action on a contract. In August, 1919, the Cuyahoga Builders Supply Company, through its representative, Eben S. Martin, called on the Walter Wallingford Coal Company, for the purpose of purchasing coal.

The petition recites that the plaintiff entered into a contract with the defendant by the terms of which the plaintiff agreed to buy and the defendant agreed to sell 100 cars Hocking Deep Mined Nut and Slack coal, first quality coal, standard preparation, to be delivered as per plaintiff's order, at the price of $1.15 per ton, f. o. b. mines; that the plaintiff requested the defendant to deliver said coal; that it failed and refused to deliver coal as per the agreement; and that at the time for the delivery the market value of the coal specified in the agreement was $2.25 per ton. The

petition prayed judgment against the defendant in the sum of $10,000, with interest from September 1, 1919.

The defendant for answer waived the issuing and service of summons, and entered its appearance. It admitted its incorporation, that it was doing business in Cincinnati, Ohio, denied each and every other allegation contained in the petition, and prayed to be dismissed.

The case was tried in the superior court of Cincinnati. The jury returned a verdict for plaintiff in the sum of $6,717.34. The court entered judgment on that verdict, and this action is prosecuted to reverse the judgment.

Several errors are assigned by plaintiff in error as ground for reversal.

The following facts appear from the record.

On August 3 and 4, 1919, Martin was at the offices of the defendant in Cincinnati, and talked with its sales manager with reference to the purchase of 100 cars of coal, and for the purpose of determining the character of the coal he asked the defendant to state the point from which the coal would be shipped. The defendant stated that it was unable to answer that question, as it would have to communicate with its Pittsburg office to get the information.

Beginning August 5, and continuing until in September, numerous telegrams, letters, and long distance telephone conversations were exchanged between the parties, and on August 9, the plaintiff sent the defendant its formal order for "100 cars Hocking Deep Mined Nut and Slack coal, first quality coal, standard preparation, and to come forward as per order which will follow by letter."

In the course of the correspondence this order was referred to as No. 1720. All the communications from the plaintiff to defendant after that time referred to the order by that number, in addition to designating the quality of the coal to be shipped as Hocking Deep Mined Nut and Slack coal, first quality coal, standard preparation.

The defendant did not ship any coal prior to August 16. About August 30 a number of cars of coal arrived in Cleveland. The plaintiff examined the coal and wrote the defendant: "Whereas, you will note our order calls for Hocking Deep Mined Nut and Slack coal, first quality coal, standard preparation, and we are advised that the coal shipped us is not in accordance with our order. * * * We regret very much that it is necessary for us to refuse the coal in question, but we could not take any other action."

Mr. Martin testified that on August 8 he telephoned the defendant and specifically stated the kind and quality of coal that was to be shipped. There seems to be no dispute that the coal shipped was what is known as stripping coal.

The record discloses that the difference between stripping coal and deep mined coal is that the former is produced by removing any foreign substance, like soil, from the coal, and then digging it, the coal, with a steam shovel. Coal of this character, where there is little soil covering it, is soft and of inferior quality. Deep mined coal is produced by mining it out of a vein, after the stripping process has been completed, and is produced by shaft, or drift, or slope mining. The deep mined coal contains more B. T. U., that is more heat units, than the stripping coal.

The defendant claims that it sold and was to ship Hocking Nut and Slack; that the minds of the parties never met and agreed on the terms of the contract, and, therefore, no contract ever existed between them.

From the record it is evident that if there was a contract between the parties, as stated by the plaintiff, it was breached, and that the only question here for consideration is: Was there a contract as stated in the petition?

The reference above to the telephone conversation of August 8, the order of August 9, and the subsequent actions thereunder, all lead to the conclusion that the minds of the parties did agree on all the essential elements of the contract. If the defendant had a mistaken idea in regard to the meaning of the offer of plaintiff to purchase coal, that could not be held to be an acceptance of a different character of coal from that ordered by the plaintiff. And, conversely, if the defendant offered to sell nut and slack coal, and the plaintiff did not accept that offer, but made an offer to purchase Hocking Deep Mined Nut and slack coal, and that offer was in such form as not to be mistaken, and the defendant, after receiving such offer, shipped coal in pursuance of order No. 1720, it is bound by its acceptance of the offer as made in the order. It was held in *American Lumber & Mfg. Co.* v. *Atlantic Mill & Lumber Co.*, 290 Fed., 632, syllabus 3, 4 and 5:

"One who makes an offer and assents to an acceptance not responsive to the proposal enters into a contract on the terms of the acceptance and is bound thereby.

"Where the acceptance of an offer imposes new

terms, the proposer's assent to such new terms may be inferred from the fact that the parties thereafter proceeded to conduct business under the conditional acceptance.

"Where the evidence is conflicting as to the existence of a contract, the question is for the jury to determine whether a contract does in fact exist, and, if so, what are its terms."

On the question of the contract, we call attention to the case of *McKell* v. *C. & O. Ry. Co.*, 175 Fed., 321, wherein the court uses this language:

"Counsel for defendant now insist that there never was a contract, and in argument press the fact that there was never any written acceptance of the fresh conditions which they find in McKell's last letter of April 26, 1892. But it is sufficient answer to this that the parties proceeded with their contract as if these supposed conditions were a part of it, and this was as effectually an acceptance as if they had been formally accepted."

A similar holding was made in the case of *Lawrence* v. *Milwaukee, L. S. & W. Rd. Co.*, 84 Wis., 427, 54 N. W., 797.

In view of the fact that the meeting of the minds of the parties to a contract may be shown not only by their words, but by the conduct of either or both, and in view of the provisions of Section 8429, General Code, we conclude from the record that the terms of the offer or counter-offer, as it may be, of the plaintiff, and the shipping of coal afterwards, in pursuance of that order, made a binding contract between the parties.

*Judgment affirmed.*

BUCHWALTER and HAMILTON, JJ., concur.